## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CITY SPORTS, INC., *et al.*, | Case No. 15- <u>12054</u>  (___) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF ANDREW W. ALMQUIST IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Andrew W. Almquist, being duly sworn, deposes and says:

1.      I am the Senior Vice President and Chief Financial Officer of City Sports, Inc. and City Sports-DC, LLC (together, the "<u>Company</u>" or "<u>Debtors</u>") in the above captioned Chapter 11 cases (the "<u>Chapter 11 Cases</u>").  I have been employed by the Debtors since March 4, 2013 and am responsible for overseeing the general accounting and financial planning of the Company.  As such, I have developed substantial institutional knowledge regarding the Debtors' finances, day-to-day operations, business affairs, and books and records.

2.      I am over the age of 18, competent to testify, and authorized to submit this Declaration in support of the Debtors' Chapter 11 petitions and the first day pleadings described herein (the "<u>First Day Motions</u>").

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  City Sports, Inc.. (6205); and City Sports-DC, LLC (6205).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  77 N. Washington Street, Boston, MA 02114.

4.      The Debtors remain in possession and continue to manage and operate their

businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

No trustee, examiner or official committee of unsecured creditors has been appointed in these

Chapter 11 Cases.

5.      The Debtors have filed or anticipate filing the following First Day Motions:

     i.    *Debtors' Motion for an Order Directing Joint Administration of Cases Pursuant to Fed. R. Bankr. P. 1015(b)* ("Joint Administration Motion");

    ii.    *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, and (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (II) Approving the Manner of Serving the Notice of Commencement* ("Consolidated Creditor List Motion");

    iii.    *Debtors' Application for Appointment of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent* ("Claims Agent Application");

    iv.    *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System, Existing Bank Accounts and Business Forms, and (II) Extending the Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code* ("Cash Management Motion");

    v.    *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits* ("Wage Motion");

    vi.    *Debtors' Motion for Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service* ("Utilities Motion");

    vii.    *Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees* ("Tax Motion");

    viii.    *Debtors' Motion for Authorizing Payment of Certain Prepetition Shipping and Delivery Charges and Granting Certain Related Relief* ("Shipping and Delivery Motion");

    ix.    *Debtors' Motion for Interim and Final Orders Authorizing the Debtors to (I) Honor Certain Prepetition Obligations to Customers, (II) Continue*

*Customer Programs and (III) Receive, Process and Honor Credit Card Transactions* ("Customer Programs Motion");

x.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral (II) Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* (the "Cash Collateral Motion");

xi.    *Debtors' Motion for an Order Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman* (the "CPO Motion"); and

xii.    *Motion to Shorten Notice and Objection Periods on the Debtors' Motion for (I) an Order (A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Certain Related Relief, and (II) an Order (A) Approving the Proposed Sale, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Motion to Shorten").

6.    Additionally, the Debtors anticipate filing at the outset of these Chapter 11 Cases, among other things, applications seeking authorization for the Debtors to retain certain professionals in connection with these Chapter 11 Cases and a motion to establish interim compensation procedures for such professionals.

7.    I am submitting this declaration in support of the Debtors' chapter 11 petitions and the First Day Motions.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, my review of the relevant documents, or my experience with, and knowledge of, the Debtors' operations and financial condition.  If called upon, I could and would testify consistently to the facts set forth herein.

8.    This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these Chapter 11 Cases.  Part I of this Declaration provides background information about the Debtors and their business operations.  Part II recounts the

circumstances and events preceding the bankruptcy filings.  Part III affirms and incorporates the

fats that support the relief requested in the First Day Motions.

<div align="center">

**PART I**

**BACKGROUND**

</div>

**A.    THE DEBTORS' OPERATIONS AND BUSINESS.**

9.    Founded in 1983, the Company is a Boston-based specialty sports retailer that

offers performance footwear, athletic apparel, and equipment from leading brands as well as the

Company's own "CS by City Sports" line for running, fitness, swimming, cycling, tennis, yoga

and team sports.

10.    The Company's products are sold through the Company's retail stores and on its

e-commerce website.  As of the Petition Date, that operates 26 retail stores in metropolitan

locations in Massachusetts, Rhode Island, New York, Pennsylvania, Maryland, New Jersey, and

Vermont, as well as Washington D.C.  The Company leases two warehouse facilities for their

inventory, both of which are located in Wilmington, MA (the "Distribution Centers").

11.    The specialty sports retail business is highly competitive, and the Debtors'

businesses account for a fraction of the total market athletic equipment and apparel.  The

Company's stores compete with other sports apparel stores, department stores, manufacturer-

owned factory outlet stores and other retail outlets.  At various times of the year, department

store chains and specialty shops offer brand-name merchandise at substantial markdowns which

further intensifies the competitive nature of the industry.

12.    As of the Petition Date, the Debtors owned assets of approximately $38.6 million

on a consolidated basis.  As of the Petition Date, the Debtors had aggregate liabilities of

approximately $39.6 million.  The Debtors' revenue for 2015 through the Petition Date is

approximately $45 million.

**B.      THE DEBTORS' CORPORATE STRUCTURE**.

13.      City Sports, Inc., a Delaware C-corporation, is the parent company.  City Sports-DC, LLC is a wholly owned subsidiary of City Sports, Inc.  City Sports, Inc. is party to all agreements and leases of the retail stores with the exception of the store located at Gallery Place in Washington D.C. where City Sports-DC, LLC is the tenant.

14.      City Sports, Inc. issued (i) 15,678,390 shares of Series D Convertible Preferred Stock ("Series D"); (ii) 6,099,994 share of Series D-1 Convertible Preferred Stock ("Series D-1"), (iii) 1,464,460 shares of Series E Convertible Stock ("Series E"), and (iv) 324,176 shares of common stock ("Common Stock").  The Series D, Series D-1, and Series E are convertible to common stock at any time at the option of the shareholder.

15.      The majority equity holders of City Sports are (i) Highland Consumer Fund I Limited Partnership, (ii) Highland Consumer Fund I-B Limited Partnership, and (iii) Highland Consumer Entrepreneurs Fund I Limited Partnership, who together hold 83.7% of the equity in City Sports, Inc.  The remaining 16.7% of the equity in City Sports is held by various individual investors.  A list of all of the shareholders are attached to the chapter 11 petition of City Sports, Inc.

**C.      THE DEBTORS' CAPITAL STRUCTURE.**

16.      The Debtors are borrowers (the "Borrowers") under the First Amended and Restated Credit Agreement, dated as of July 28, 2011 (as amended, the "Prepetition Credit Agreement") with Wells Fargo Bank, National Association ("Wells Fargo") as a lender and as agent for the lenders that are from time to time parties to the Prepetition Credit Agreement (together, with Wells Fargo in its capacity as a lender, the "Lenders").

17.      The Prepetition Credit Agreement provides for a $20 million revolving loan, inclusive of a $4 million committed accordion, (the "Revolver") (of which up to $3.5 million

may be used for letters of credit as described below), and a $4.5 million term loan (the "Term Loan") and the obligations thereunder mature on March 19, 2019.  The obligations of the Borrowers under the Prepetition Credit Agreement are secured by substantially all of the assets of the Debtors, other than leasehold interests.  As of the Petition Date, approximately $12.15 million is outstanding under the Revolver and approximately $1.9 million is outstanding on the Term Loan.

18.     The Prepetition Credit Agreement also provides for the issuance of letters of credit to finance the Debtors' acquisition of inventory from suppliers, to provide standby letters of credit to landlords, insurance providers and other parties for business purposes and for other general corporate purposes.  The outstanding amount of all letter of credit obligations may not exceed $3.5 million.  As of the Petition Date, the aggregate amount of outstanding letters of credit issued by Wells Fargo is approximately $411,000, all of which were issued in connection with providing security deposits for landlords.

**PART III**

**EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES**.

19.     Starting in August 2014, the Company's revenue and profitability declined due to several factors, including the extremely competitive market for athletic apparel (especially from Nike, Asics and Under Armour), and still struggling national economy and record setting weather in the Northeast impacting the sale of various types of athletic apparel.  The Company has faced increased competition for declining consumer purchases for the types of apparel and products the Company sells.

20.     In response, the Company undertook numerous initiatives to improve their performance and maximize value.  The Company engaged FTI Consulting, Inc. ("FTI") to identify opportunities to reduce costs.  FTI identified several potential cost savings measures

which the Company has reviewed and begun to implement.  These include the reduction of store

labor (both the number of employees and hours) before opening and after closing hours and

reducing store operating hours (which the Company has done in eight (8) out of the

recommended eleven (11) stores).

21.    The Company has also reduced lowered freight costs by reducing the number of

deliveries in three of their stores to once a week, and as a result, the Company has seven (7)

stores where deliveries are made only once a week.  The Company is continuing to explore ways

to reduce freight costs and has created a committee to examine which of the Company's other

stores may be a candidate for reductions in store deliveries going forward.  The Company has

increased promotional activity to drive traffic and move inventory.  The Company has also

implemented a hiring freeze on all new positions and is only filling turnover in critical positions,

such as their Director of Stores.

22.    In September 2015, the Company engaged Hilco Real Estate, LLC ("Hilco") to

negotiate with landlords of the stores for rent concessions.  Unfortunately, after extensive

negotiations, the Company was not able to obtain agreement with many of the landlords for rent

concessions and for those that did agree, the concessions were not as significant as the Company

had hoped.

23.    Consequently, prior to the Petition Date, the Company and its advisors have

proceeded on a dual track of (i) reaching out to liquidators to conduct store closing sales for

approximately six to eight underperforming stores, and (ii) contacting parties who may be

interested in purchasing the remaining assets and stores as a going concern, or if no such sale

occurs, to conduct an orderly liquidation of the Debtors' assets.

24.      The Company  contacted four well recognized liquidation firms and received bids

from two.  The Company entered into a consulting agreement, dated October 3, 2015 (the

"Consulting Agreement") with Tiger Capital Group, LLC ("Tiger") to provide inventory

consulting and fixture disposition services for eight stores for a flat fee of $25,000 plus expenses.

As of the Petition Date, the Debtors intend to continue to comply with its obligations under the

Agreement with Tiger and seek approval of the assumption of such agreement shortly after the

commencement  these Chapter 11 Cases.

25.      For the remaining eighteen (18) stores, the Company continues to negotiate with

parties that have already expressed an interest in acquiring a portion or substantially all of the

Debtors' assets.  The Debtors intend to also file a motion to approve bid procedures and sale

motion at the outset of these Chapter 11 Cases to pursue the sale of the remaining eighteen stores

as a going concern.  While the Debtors are hopeful that such a sale will be consummated, the

Debtors will seek, in the alternative, to commence store closing and going out of business sales

immediately in order to take full advantage of the upcoming holiday shopping season.

26.      The Debtors have filed these Chapter 11 Cases to best maximize value for the

benefit of all interested parties - including creditors and stockholders - by either conducting a

sale of some or substantially all of their assets as a going concern or proceeding towards an

orderly wind down and liquidation of some or all of their assets.

## PART III

## FIRST DAY MOTIONS

27.      Concurrently with the commencement of these Chapter 11 Cases, the Debtors

have filed a number of First Day Motions to minimize the adverse effects of the Chapter 11

Cases on their businesses during the pendency of the bankruptcy.  I have reviewed each of the

First Day Motions and related orders (including the exhibits attached thereto) and the facts set

forth therein are true and correct to the best of my knowledge, information and belief.  I believe

that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the

Debtors to make the transition to, and operate in, Chapter 11 with minimum interruption or

disruption to their businesses or loss of productivity or value and (b) constitutes a critical

element in achieving an orderly wind-down of the Debtors' businesses.

### A.    JOINT ADMINISTRATION MOTION.

28.    The Debtors seek entry of an order directing joint administration of these Chapter

11 Cases for procedural purposes only.  I believe that joint administration will also save time and

money and avoid duplicative and potentially confusing filings by permitting counsel for all

parties in interest to (a) use a single caption on the numerous documents that will be served and

filed herein and (b) file the papers in one case rather than in multiple cases.  I understand that

joint administration will also protect parties in interest by ensuring that parties in each of the

Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in

these cases.

29.    I have also been advised that rights of the respective creditors and stakeholders of

each of the Debtors will not be adversely affected by joint administration of these cases

inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive

rights.

### B.    CONSOLIDATED CREDITOR LIST MOTION.

30.    The Debtors request that the Court authorize them: (a) to prepare a consolidated

list of creditors in the format currently maintained in the ordinary course of business in lieu of

submitting any required mailing matrix; (b) file a consolidated list of the Debtors' 30 largest

unsecured creditors; and approving the form and manner of notice of notifying creditors of the

commencement of these Chapter 11 Cases through the mailing of the Notice of Commencement (as defined in the Consolidated Credit List Motion) by Rust Consulting/Omni Bankruptcy ("Rust Omni" or the "Claims Agent").

31.    The Debtors estimate that they have over 300 creditors on a consolidated basis. Contemporaneously with the filing of the motion, the Debtors have filed an application to retain Rust Omni as their notice and claims agent in these Chapter 11 Cases.  The Debtors believe that using the Claims Agent for this purpose will maximize administrative efficiency in these Chapter 11 Cases and reduce the administrative burdens that would otherwise fall upon this Court and the U.S. Trustee.

32.    The Debtors believe that preparing the consolidated list in the format or formats currently maintained by the Debtors in the ordinary course of business will be sufficient to permit the Claims Agent to promptly provide notices to all applicable parties.  Accordingly, the Debtors believe that maintaining their lists of creditors and equity holders in an electronic format rather than preparing and filing separate matrices will maximize efficiency, increase accuracy and reduce costs to the benefit of these estates.

## C.    CLAIMS AGENT APPLICATION.

33.    The Debtors request that Rust Omni be appointed as the claims and noticing agent for the Debtors and these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.

34.    The Debtors have obtained and reviewed engagement proposals from four other court-approved claims and noticing agents to ensure selection through a competitive process. After initial proposals were received from all five claims and noticing agents, the claims agents were asked to improve those bids and provide proposed budgets.   The Debtors submit, based on

all proposals obtained and reviewed, that Rust Omni's rates are competitive and reasonable given

Rust Omni's quality of services and expertise.

35.     Accordingly, the Debtors believe that it is in the best interests of their creditors,

stakeholders and estates to retain the Claims Agent for these Chapter 11 Cases.

**D.     CASH MANAGEMENT MOTION.**

36.     Prior to the Petition Date, the Debtors employed a cash management system to

efficiently collect, transfer, and disburse the funds generated by its business operations (the

"Cash Management System").  The Cash Management System facilitates the Debtors' cash

forecasting and reporting and enables the Debtors to monitor and record the collection and

disbursement of funds and maintain control over the administration of their Bank Accounts (as

defined in the Cash Management Motion).

37.     City Sports, Inc. has several Bank Accounts in the ordinary course of operating

their business.  City Sports-DC, LLC does not have any bank accounts.  Corporate deposits and

checks and cash from sales are deposited into the store depository accounts daily (the

"Depository Accounts").  The Depository Accounts have minimal or a zero balance at the end of

each day because funds are swept daily into the Debtors' concentration account (the

"Concentration Account").  Credit card funding is directly deposited into the Concentration

Account.  Each day, the funds in the Concentration Account are swept and applied to pay down

any outstanding balance under Revolver of Prepetition Credit Agreement.  In order to fund

payroll, operating expenses, and other disbursements, an advance is made under the Prepetition

Credit Agreement to fund the Debtors' operating account (the "Operating Account").  The funds

in the Operating Account are then distributed to the payroll and disbursement accounts on an as

needed basis for payment to third parties.  ACH and wire transfers clear from the Operating

Account.

38.     The Cash Management System is an ordinary course, essential business practice
of the Debtors.  The Cash Management System currently in place enables the Debtors to
(a) closely control and monitor corporate funds, (b) ensure cash availability, and (c) reduce
administrative expenses by facilitating the efficient movement of funds.  Altering the Cash
Management System may disrupt payments to key vendors and employees.  Therefore, it is
essential that the Debtors be permitted to continue to use their Cash Management System in
accordance with their existing cash management procedures.

39.     I believe that changing the Bank Accounts could significantly and negatively
impact Debtors' cash flow as it takes a substantial amount of time to open new accounts.  Both
the Concentration Account (where most of the Debtors' cash is held) and the Operating Account
(from which funds are disbursed to the various accounts of the Debtors on an as needed basis)
are with Wells Fargo, a financially stable banking institution with FDIC insurance.  To protect
against the unauthorized payment of prepetition obligations, the Debtors represent that if they are
authorized to continue to use the Bank Accounts, they will not pay, and Wells Fargo will be
directed not to pay, any debts incurred before the Petition Date, other than as authorized by this
Court.  In the event there are funds currently in an account at a Bank other than Wells Fargo, the
Debtors will direct such Bank not to pay any debts incurred before the Petition Date, other than
as authorized by this Court.

40.     To minimize expenses to their estates, the Debtors also request authority to use all
checks and other business forms, including electronic forms and paper forms, preprinted
letterhead and related documents (collectively, the "Business Forms") that were in existence
immediately before the Petition Date.  Given that the Business Forms were used prepetition, they
do not include references to the Debtors' current status as debtors in possession.  As is the case

with the existing Cash Management System, I believe that requiring the Debtors to change

existing Business Forms would unnecessarily distract the Debtors from their efforts away from

administering these Chapter 11 Cases and impose needless expenses on the estates, without any

meaningful corresponding benefit.

       41.     Due to the nature and scope of the Debtors' business operations and the large

number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is

important that the Debtors be permitted to continue to use the Business Forms without alteration

or change and without the "Debtor-in-Possession" designation.

       42.     Accordingly, the Debtors believe that it is in the best interests of their creditors,

stakeholders and estates continue to maintain and use their existing Cash Management System,

Bank Accounts and Business Forms.

**E.     WAGE MOTION.**

       43.     The Debtors' workforce is comprised of full-time salaried employees (the

"Salaried Employees"), full-time hourly employees (the "Hourly Employees," and together with

the Salaried Employees, the "Full Time Employees") and regular part-time hourly employees

("Part Time Employees").  As of the Petition Date, the Debtors employ approximately 816

employees, 20 to 45 temporary employees and two (2) contractors.  The Debtors employ

approximately 192 Hourly Employees and 94 Salaried Employees, for a total of 268 Full Time

Employees, and 530 regular Part Time Employees.  Thirty-nine (39) of the Full Time Employees

work at the Debtors' Distribution Centers located in Wilmington, MA (the "Distribution Center

Employees").

       44.     With the exception of approximately 15 employees in the debtors' Providence, RI

location who are paid weekly, all Employees are paid bi-weekly (every other Thursday) by either

check or direct deposit.  All Employees are paid through and including the previous Sunday.  For

the last payroll ending on October 1, 2015, the amount, including employer-paid taxes, was $453,050.03 for all the Employees.  The Debtors' next scheduled payroll date is October 15, 2015.

45.    The Debtors request that the Court enter an order, authorizing, but not directing, the Debtors:  (a)  to pay and/or perform, as applicable, prepetition obligations to current employees, retirees and independent contractors, including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims"); (b) to honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation, sick time and holiday time policies, workers' compensation, employee and retiree benefit plans and programs (collectively, the "Employee Benefit Obligations"), as described below, and to pay all fees and costs in connection therewith, except as otherwise set forth herein; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) to pay all related prepetition withholdings, and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Taxes"); and (e) to pay all administrative fees and employee contributions to Employee 401(k) plan (the "401(k) Obligations" and, together with the Employee Claims, the Employee Benefit Obligations, the Employee Expense Obligations and the Employee Taxes collectively, the "Prepetition Employee Obligations"), all as described in detail in the Wage Motion.

46.    The Debtors believe, in the exercise of their business judgment, that relief is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors

by allowing the Debtors to conduct the postpetition liquidation and wind-down process effectively.  Indeed, the Debtors believe that without the relief requested herein being granted, their Employees may seek alternative opportunities sooner than the liquidation is complete.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to conduct an orderly wind down.

47.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to continue to honor and pay the Prepetition Employee Obligations.

**F.     UTILITIES MOTION.**

48.     In connection with the operation of their businesses and the management of their properties, the Debtors obtain water, gas, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") from the Utility Companies covering a number of utility accounts.  The relief requested herein is for all Utility Companies providing Utility Services to the Debtors and is not limited to those listed on the Utility Company List attached to the Interim Order as Schedule 1.

49.     On average, prior to the Petition Date, the Debtors spent approximately $89,000 each month on account of Utility Services.  Included in the calculation of this amount are certain utilities that are included in the Debtors' rent payments to landlords at certain store locations who are then responsible for paying the relevant utility companies.  Currently, certain of the Utility Companies already hold deposits of approximately $7,000 in the aggregate.

50.     Uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases.  Should any Utility Company alter, refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' efforts.  It is essential that the Utility Services continue uninterrupted.

**G.    TAX MOTION.**

51.    Prior to the Petition Date, the Debtors in their ordinary course of business, incurred various Taxes, including state and local sales and use tax liabilities.  The Debtors estimate they may be liable for approximately a total of $200,000 in Taxes, all of which are sales and use taxes that must be remitted to the Taxing Authorities.

52.    Sales and use taxes accrue as the Debtors sell merchandise or consume goods and are calculated on the basis of statutorily mandated percentages of the price at which the Debtors' merchandise is sold and/or cost of merchandise consumed.  As of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the prepetition period were not yet due.  Out of an abundance of caution, the Debtors are also seeking authority to pay any other prepetition Taxes that may remain outstanding.

53.    The continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby creating a greater recovery for creditors and stakeholders.  If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether the obligations are proratable or fully prepetition or postpetition, and whether penalties, interest, and attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured or unsecured in nature.

54.    Further, I have been advised that certain Taxes may constitute "trust fund" taxes that are not included in property of the Debtors' estates, and/or obligations as to which the Debtors' officers and directors may have personal liability in the event of nonpayment.  Efforts

by Taxing Authorities to collect such taxes would provide obvious distractions to the Debtors

and their officers and directors in their efforts to maximize the value of the estates.

55.     Finally, certain Taxing Authorities either have not been paid or have been sent

checks and/or wires for Taxes that may or may not have been presented or cleared as of the

Petition Date.  Similarly, in other cases, obligations have accrued or are accruing, or are subject

to audit or review, but have not yet become due and payable.  Accordingly, the Debtors seek

authorization for their banks to honor prepetition checks and wires issued by the Debtors to the

Taxing Authorities in payment of prepetition Taxes that, as of the Petition Date, have not cleared

or been transferred.  In addition, to the extent the Debtors have not yet sought to remit payment

to the Taxing Authorities with respect to certain Taxes, the Debtors seek authorization to issue

checks or provide for other means of payment to the Taxing Authorities as necessary to pay the

Taxes.

56.     I believe that it is in the best interest of the Debtors' estates that the Taxes be paid

on time so as to avoid any disruptions.  Delayed payment of the Taxes may cause the Taxing

Authorities to take precipitous action, including a marked increase in state audits, a flurry of lien

filings, and significant administrative maneuvering at the expense of the Debtors' time and

resources.  Prompt and regular payment of the Taxes will avoid this unnecessary governmental

action.

## H.     SHIPPING AND DELIVERY MOTION.

57.     In the ordinary course of their businesses, the Debtors incur certain fees and

charges to several common carriers to ship, transport, store and deliver goods through the

Debtors' established distribution networks.  The Debtors have contracts with these common

carriers for the transportation services provided.  The contracts typically set forth agreed upon

rates for the transportation services.  The common carriers are generally not paid in advance but

rather invoice the Debtors for shipping services previously rendered.  At any given time, there are common carriers shipping goods to the Debtors' Distribution Centers (defined below) as well as carriers shipping goods from the Distribution Centers to the Debtors' stores.  In addition, the Debtors may be required to pay customs duties for goods delivered to them from overseas.

58.    The Debtors rely extensively on their Shippers to distribute and transport merchandise to and from their two distribution centers in Wilmington, MA (the "Distribution Centers").  The Debtors also may rely on their Shippers to return goods, merchandise and products to the Debtors' vendors.  The services provided by these Shippers are critical to the day-to-day operations of the Debtors' retail business.  At any given time, shipments are en route to the Debtors' Distribution Centers and stores.  As of the Petition, the Debtors owe approximately $300,000 of Shipping Charges.

59.    The Debtors rely extensively on their Shippers to distribute and transport merchandise to and from their Distribution Centers.  The Debtors also may rely on their Shippers to return goods, merchandise and products to the Debtors' vendors.  The services provided by these Shippers are critical to the day-to-day operations of the Debtors' retail business.  At any given time, shipments are en route to the Debtors' Distribution Centers and stores.

60.    The Debtors seek to pay the prepetition Shipping Charges for several reasons.  First, because of the filing of these Chapter 11 Cases, certain Shippers who hold goods for delivery to or from the Debtors may refuse to release such goods pending payment for their services.  Second, if the prepetition Shipping Charges are not paid, many of the Shippers may refuse to perform future services for the Debtors.  In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace the Shippers, which amounts may exceed

the amount of unpaid prepetition Shipping Charges that the Debtors request permission to pay hereunder.

61.    Third, because of the method of distribution employed by the Debtors, as well as space limitations, the Debtors' Distribution Centers and the stores themselves hold only limited quantities of merchandise at a given time.  If shipments from the Distribution Centers to the stores are not made promptly and regularly, the Debtors may risk having inadequate in-store inventory, which would disrupt the Debtors' reorganization efforts.

62.    Finally, I have been advised that any delays in payment of Shipping Charges with respect to goods that are in the possession of the Shippers as of the Petition Date will likely result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such parties.

63.    Accordingly, it is the Debtors' business judgment that the failure to pay the Shipping Charges could have a material adverse impact on the operations of their businesses and, thus, their efforts to maximize the value of their estates.

## I.    CUSTOMER PROGRAMS MOTION.

64.    Prior to the Petition Date, in the ordinary course of business, the Debtors engaged in certain marketing and sales practices that are, among other things, (i) targeted to develop and sustain a positive reputation for their goods in the marketplace and (ii) designed to attract new customers and to enhance loyalty and sales among the Debtors' existing customer base.  These customer-targeted practices (collectively, the "Customer Programs"), all as described in the Motion.  The Debtors seek authority to maintain certain Customer Programs and Credit Card Processing (as defined and described in detail in the Motion) to avoid disruption to the Debtors' business operations.

65.     The ability of the Debtors to maximize the value of their inventory for the benefit of their creditors and stakeholders is dependent upon the patronage of their customers.  In this regard, the Debtors' Customer Programs and Credit Card Processing are critical, and any delay in honoring the Debtors' obligations thereunder could severely disrupt Debtors' operations.

66.     Moreover, I am advised that the failure to continue the Customer Programs may subject the Debtors to liability for consumer deceptive trade practices.  Most, if not all, of the states where the Debtors conduct their business have enacted statutes declaring unlawful any deceptive trade practices by any business being conduct in that state.  The Debtors' customers have a certain expectation that the Debtors will honor the Customer Programs prior to the Petition Date and rely on such representations when purchasing merchandise and participating in the Customer Programs.  Thus, it is necessary for the Debtors to continue the Customer Programs in order to avoid liability for claims arising out of state law consumer deceptive trade practices acts.

67.     I believe that any failure to honor prepetition customer obligations or inability to process credit card transactions, for even a brief time, may well drive away valuable customers, thereby harming the Debtors' efforts to maximize the value of their inventory.  Accordingly, I believe that it is in the best interests of their creditors, stakeholders and estates to continue the Customer Programs and Credit Card Processing.

**J.     CASH COLLATERAL MOTION**

68.     The Debtors require immediate access to Cash Collateral to ensure that they are able to continue the operation of their business during the pendency of these Chapter 11 Cases while they pursue a potential going concern sale of substantially all of their assets, or if no such sale occurs, to conduct an orderly liquidation of the Debtors' assets.  The Cash Collateral is the Debtors' sole source of funding for operations and the costs of administering these Chapter 11

Cases. Absent authority to use Cash Collateral immediately, the Debtors would need to immediately cease operations that would cause irreparable harm to the Debtors' creditors and their estates.

69.     I believe that access to the Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to operate their business while they pursue the sale of their assets (or if no such sale occurs, to conduct an orderly liquidation of the Debtors' assets) thereby maximizing value for the Debtors' estates and creditors. Without such access to liquidity, the Debtors' ability to navigate through the Chapter 11 process will be jeopardized, to the detriment of all of the Debtors' stakeholders.

**K.      CPO MOTION.**

70.     As noted above, the Debtors are seeking to sell some or substantially all of their assets. While the Debtors are uncertain whether any personally identifiable information ("PII") will be sold at this point in time, the Debtors believe that if there is such a sale of PII, it will be part of a larger pool of assets that the Debtors will seek to have approved on an expedited basis.

71.     The Debtors believe that the appointment of a consumer privacy ombudsman (the "CPO") at the outset of these Chapter 11 cases will allow the CPO to familiarize himself or herself to the Debtors privacy policy so that if any PII is proposed to be sold, the CPO is in a better position to identify any issues and potential resolutions quickly and efficiently without delaying the Debtors' sale process.

72.     Accordingly, I believe that it is in the best interests of their creditors, stakeholders and estates that a consumer privacy ombudsman is appointed at the outset of these Chapter 11 Cases.

**L.       MOTION TO SHORTEN.**

73.     As discussed above, prior to the Petition Date, the Debtors and FTI performed an in-depth analysis of the Company's financial performance that helped management identify some key steps that could be taken to improve the Company's overall financial performance.  In that regard, the Debtors have also explored a number of options to reorganize its business in and outside of a bankruptcy.  In the days leading up to the Petition Date, the Company received interest by various parties for the purchase of their assets as a going concern (a "Going Concern Transaction").

74.     To date, the Debtors continue to negotiate with these interested parties and are hopeful that these parties will submit bids on the Debtors assets as a Going Concern Transaction during these Chapter 11 Cases.  In the meantime, to preserve optionality, the Debtors are also seeking bids from liquidation firms for a partial or full liquidation (a "Liquidation Transaction") in the event the Going Concern Transaction bids are only for a portion of the Debtors' assets or are less than the bids received from the liquidation firms for all of the Debtors' assets.

75.     In either event, whether the Debtors proceed with a Going Concern Transaction or a Liquidation Transaction, it would be in the best interests of the Debtors and their estates and creditors to consummate such transaction as soon as possible.  The Debtors' business is deteriorating because there is insufficient cash to purchase new inventory thereby negatively impacting their revenue stream, while the Debtors continue to accrue rent and other administrative expenses that would be borne by the Debtors' estates.

76.     Given the Debtors' financial performance, they would need to close on a Going Concern Transaction no later than October 30, 2015, so that in the event that such a Going Concern Transaction cannot be consummated, the Debtors may commence going out of business

and liquidation sales on that date and take full advantage of the upcoming holiday shopping season and end all such sales by mid-December.

77.     Furthermore, I believe that establishing a Preliminary Bid Deadline now will save time and allow the Debtors to assess who the bona fide bidders will be.  Depending on the interest that the Debtors receive by the Preliminary Bid Deadline, the Debtors will need to assess the risks associated with those initial bids and must decide whether, alternatively, they need to exercise their option to have Tiger Capital Group, LLC ("Tiger") conduct liquidation and store closing sales immediately pursuant to the Consulting Agreement.


[*Remainder of page left intentionally blank.*]

\*        \*        \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 5 , 2015
       Boston, MA

<div style="margin-left: 40%;">

CITY SPORTS, INC. AND
CITY SPORTS-DC, LLC

By:  _____
     Name: Andrew Almquist
     Title:   Chief Financial Officer

</div>