## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CITY SPORTS, INC., *et al.*, | ) | Case No. 15-12054 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re: D.I. 712** |

## <u>OPINION</u>

The issue at hand is: should a claim for unredeemed gift cards[1] be classified as a priority claim or a general unsecured claim?  The Commonwealth of Massachusetts (the "Commonwealth") filed a claim ("Claim") for unredeemed gift cards issued by City Sports, Inc., and City Sports-DC, LLC[2] (collectively, "Debtors") and seeks priority status on the claim under Bankruptcy Code § 507(a)(7) ("section 507(a)(7)").[3]  Debtors estimate

---

[1] This Memorandum Opinion uses the term "gift card" or "card" to refer to both gift cards and gift certificates.

[2] The last four digits of each Debtor's federal tax identification number are: City Sports, Inc. (6205), and City Sports-DC, LLC (6205).

[3] Section 507(a)(7) currently reads:

> (a)  The following expenses and claims have priority in the following order:
>
> * * *
>
>> (7) Seventh, allowed unsecured claims of individuals, to the extent of $2,850 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

11 U.S.C.A. § 507(a)(7)(West).  Since its original codification in 1978, this section has been successively denoted section 507(a)(5) (during the period 1978 – 1984), section 507(a)(6) (during the period 1984 - 2005), and 507(a)(7) (during the period 2005 - present).  4-507 Collier on Bankruptcy P 507.LH.  The text of the section has not significantly changed since its initial codification.  *Compare* Bankruptcy Reform Act of 1978, Pub. L. No. 95–598 (HR 8200), 92 Stat 2549, November 6, 1978, § 507(a)(5) with 11 U.S.C.A. § 507(a)(7) (West).  In the following discussion, the section will generally be referred to as "section 507(a)(7)," regardless of period.

the aggregate value of unredeemed gift cards at the end of its liquidation sales to be $1,182, 668.  Debtors maintain that they cannot quantify how much of this aggregate amount was sold to Massachusetts consumers, or how many gift card holders reside in the Commonwealth.  For that reason, the Commonwealth's claim is for "up to" the amount attributable to all outstanding gift cards -- $1,182,668.  Debtors contend that unredeemed gift cards are entitled only to general unsecured claim status and object to the Claim in its entirety on two grounds: (1) the Claim is misclassified as a priority unsecured claim pursuant to section 507(a)(7), and (2) it is not supported by the Debtors' books and records.  Debtors' Second Omnibus Objection to Claims (Substantive) to Certain: (A) Misclassified Claims; (B) Overstated Claims; and (C) No Liability Claims, dated May 17, 2016 (D.I. 712) ("Objection").

The issue raised by the Commonwealth is important and the Court will decide it. The Court notes, however, that it may be a purely academic issue because it appears that the Debtors may be close to administrative insolvency.  If so, there may not be enough to pay the Claim, even were the Court to grant the Claim priority status.

## FACTS

Debtors were founded in 1983 as a Boston-based specialty sports retailer offering "performance footwear, athletic apparel, and equipment from leading brands as well as [its] own 'CS by City Sports' line" for various sports.  Response Of The Commonwealth Of Massachusetts To The Debtors' Letter Memorandum On The Issue of Classification Of Gift Card Claims, filed July 27, 2016 (D.I. 792) ("Response to Letter") at 2; Declaration of Andrew W. Almquist in Support Of Chapter 11 Petitions And First Day Motions, dated

October 5, 2015 (D.I. 15) ("Almquist Dec. I") ¶ 9.  Debtors sold their products through their retail stores in Massachusetts, Rhode Island, New York, Pennsylvania, Maryland, New Jersey, and Vermont, as well as on their e-commerce website.  Response to Letter at 2; Almquist Dec. I ¶ 10.  Debtors filed voluntary petitions for relief under Chapter 11 on October 5, 2015, "seeking to sell some or substantially all of their assets."  Almquist Dec. I ¶¶ 3, 70.

Before commencing Chapter 11 proceedings, the Debtors sold pre-paid gift cards to consumers at their stores and through their website.  Debtors' Letter to the Court, filed June 30, 2016 (D.I. 770) ("Letter"), Ex. D (Declaration of Andrew W. Almquist, dated June 30, 2016 ("Almquist Dec. II") ¶ 4)[4]; Response to Letter at 3.  City Sports, Inc. is the entity obligated on the gift cards.  Almquist Dec. II ¶ 7.  The gift cards have no expiration date; many of the cards state on their face: "There are no . . . expiration dates with this card." Response to Letter at 3; *see also* Affidavit of Paul Bockelman (D.I. 792-1)("Bockelman Aff.") ¶ 4 and Exs. 1A and 1B; Affidavit of George Dubin (D.I. 792-2)("Dubin Aff.") ¶ 3 and Exs. 1A and 1B; Affidavit of Christopher Rogers (D.I. 792-3)("Rogers Aff.") ¶ 4 and Exs. 1A and 1B; Affidavit of Jose Roberto Yau (D.I. 792-4)("Yau Aff.") ¶ 5 and Exs. 1A and 1B.  Other gift cards, also lacking expiration dates, state in bold red capital letters: "TREAT THIS CARD LIKE CASH."  Response to Letter at 3; *see also* Bockelman Aff. ¶ 4-

---

[4] As of June 30, 2016, Andrew W. Almquist was the Senior Vice President and Chief Financial Officer of the Debtors during their Chapter 11 cases.  Almquist Dec. II ¶ 1.  His employment with the Debtors began on March 4, 2013.  *Id.*  During his employment with the Debtors he was responsible for overseeing their general accounting and financial planning.  *Id.*  He declares "I have developed substantial institutional knowledge regarding the Debtors' finances, day-to-day operations, business affairs, and books and records."  *Id.*

5 and Exs. 1A and 1B.  The Debtors have not sold gift cards postpetition.  Almquist Dec. II ¶ 4.

The Debtors sold gift cards to "individual consumers and/or businesses that purchased them as gifts."  *Id.*  "The Debtors also issued gift cards in exchange for merchandise returns, and as credit for reward points in connection with the Debtors' loyalty club rewards program."  *Id.*

The Debtors have very little data regarding the gift cards, nor are they able to obtain much additional data.  They lack knowledge regarding "whether a holder of a gift card received the card as a gift, credit for merchandise return or in connection with the rewards program."  *Id.*  They do not know how any given gift card will be used.  *Id.* ¶ 5. They "are not able to know the identity of or have contact information for all gift card buyers or holders."  *Id.*  Furthermore, they "have never kept a record by state of where unredeemed gift cards are located or who holds them; though a report could be run with respect to the activation of gift cards by store number."  *Id.*  The report "would not contain information regarding the balance of the gift card or any customer information; just the date it was activated and in which store."  *Id.*  Even if Debtors could determine in which store a given gift card was activated, they "do not have any information on whether the current holder of such gift card resides in that same state or another state."  *Id.*

Despite Debtors' assertions that they lack card-related data, the Commonwealth states that it "is informed and believes that in connection with these online gift card purchases, Debtors collected consumers' contact information, including name, address,

and email address."  Response to Letter at 4; Affidavit of Investigator Marlee Greer (D.I. 792-5)("Greer Aff.") ¶ 12.

As of the October 5, 2015 Petition Date, the "approximate amount of outstanding unredeemed gift cards is $1.4 million." Almquist Dec. II ¶ 7.  Gift cards were accepted at and redeemable at Debtors' stores for the first thirty days after entry of the November 6, 2015 Order Approving Sale of All Or Substantially All Of Debtors' Assets And Granting Related Relief (D.I. 277) ("Sale Order").  *Id.*  Pursuant to the Sale Order, Debtors conducted going out of business and store closing sales (the "GOB Sales"), which were completed on December 29, 2015.  *Id.* ¶¶ 7-8.  Debtors estimate that after the GOB Sales the total amount of outstanding unredeemed gift cards is approximately $1.18 million, of which approximately $1 million is attributable to cards that were activated over a year before the Petition Date.  *Id.* ¶ 8.

The Commonwealth presents affidavits of consumers who maintain that they "were not informed that gift card redemption would be limited and did not expect that the stores would stop accepting gift cards before City Sports closed for business." Response to Letter at 5; Dubin Aff. ¶¶ 5, 8; Rogers Aff. ¶¶ 5, 7; Bockelman Aff. ¶¶ 6, 9.

On March 23, 2016, the Commonwealth filed the Claim.[5]  On May 17, 2016, Debtors filed the Objection (D.I. 712).   The Commonwealth submitted its Response of The Commonwealth of Massachusetts To The Debtors' Second Omnibus Objection to Claims (D.I. 741) (the "Response") on June 16, 2016.  The Court held a hearing on June 17, 2016

---

[5] The Proof of Claim consists of claim nos. 25 and 203, docketed at Rust Consulting Omni Bankruptcy, available at: www.omnimgt.com.

(D.I. 756) (the "Hearing").  The Debtors submitted their Letter on June 30, 2016 (D.I. 770).

The Commonwealth filed its Response to Letter (D.I. 792) and related affidavits (D.I. 792-

1, -2, -3, -4, -5) on July 27, 2016.

## LEGAL STANDARD

This Court has subject matter jurisdiction over this controversy under 28

U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

When a claim objection is filed in a bankruptcy case, the burden of proof as to the

validity of the claim shifts between the parties.  *In re Sea Containers, Ltd.*, 2009 WL 2208128,

*2 (Bankr.D.Del. July 22, 2009) (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d

Cir.1992)).  The Court of Appeals for the Third Circuit in *Allegheny Int'l* explained the

shifting burdens of proof as follows:

> Initially, the claimant must allege facts sufficient to support the claim. If the
> averments in his filed claim meet this standard of sufficiency, it is "prima
> facie" valid. In other words, a claim that alleges facts sufficient to support
> a legal liability to the claimant satisfies the claimant's initial obligation to go
> forward. The burden of going forward then shifts to the objector to produce
> evidence sufficient to negate the prima facie validity of the filed claim. It is
> often said that the objector must produce evidence equal in force to the
> prima facie case.... In practice, the objector must produce evidence which,
> if believed, would refute at least one of the allegations that is essential to
> the claim's legal sufficiency. If the objector produces sufficient evidence to
> negate one or more of the sworn facts in the proof of claim, the burden
> reverts to the claimant to prove the validity of the claim by a preponderance
> of the evidence.... The burden of persuasion is always on the claimant.

954 F.2d at 173–74 (citations omitted).

Section 507(a) of the Bankruptcy Code contains ten categories of claims that are

entitled to priority in bankruptcy cases.  *See* 11 U.S.C. § 507(a).  Bankruptcy law prefers

that the limited estate of a debtor be equally distributed among all creditors.  *Trustees of*

*Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986); *see also In re WW Warehouse, Inc.*, 313 B.R. 588, 592 (Bankr. D. Del. 2004) (explaining that "equality of distribution among claimants is a central policy of the Bankruptcy Code . . . Priority should not be afforded unless it is founded on a clear statutory purpose . . . In other words, if one claimant is to be preferred over others, the purpose should be clear from the statute."); H.R. Rep. No. 95–595 ("HOUSE REPORT" or "Report"), at 186 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6147[6] (stating that "[t]hough the general policy of the bankruptcy laws is equality of distribution among all creditors, current law makes certain exceptions based on a showing of special circumstances or special need."). The priority statutes should be construed strictly and narrowly. *See, e.g., Boston Reg'l Med. Ctr. Inc. v. Mass. Div. of Health Care Fin. and Policy*, 365 F.3d 51, 57 (1st Cir. 2004); *Amalgamated Ins. Fund,* 789 F.2d at 100; *WW Warehouse*, 313 B.R. at 592; *In re Olga Coal Co.*, 194 B.R. 741, 745 (Bankr.S.D.N.Y. 1996); *In re Pittston Stevedoring Corp.*, 40 B.R. 424, 428–29 (Bankr.S.D.N.Y. 1984). "The burden is on the party seeking to claim priority status to prove that the claim qualifies for priority status." *In re Util. Craft, Inc.*, No. 06-10816, 2008 WL 5429667, at *2 (Bankr. M.D.N.C. Dec. 29, 2008) (citing *In re FBI Distrib. Corp.*, 330 F.3d 36, 42 (1st Cir.2003); *In re Nat'l Steel Corp.*, 321 B.R. 901, 905 (Bankr.N.D.Ill. 2005); *In re Heritage Village Church and Missionary Fellowship, Inc.*, 137 B.R. 888, 892 (Bankr. D.S.C. 1991)); *see also In re Terra Distrib., Inc.*, 148 B.R. 598, 599–600 (Bankr. D. Idaho 1992) (citing *Heritage,* 137 B.R. at 892).

---

[6] The full title of the HOUSE REPORT is: *Bankruptcy Law Revision: Report of the Committee on the Judiciary together with Separate Supplemental, and Separate Additional Views [Including Cost Estimate of the Congressional Budget Office][To accompany H.R. 8200].*

## DISCUSSION

The holders of Debtors' gift cards will get a place in the distribution line. The question is which place. Through section 507(a)(7), Congress decided to allow select claimants to receive priority status, rather than remain general unsecured creditors. Determining which claimants receive that priority treatment requires strict fidelity to the statute.[7] The Commonwealth's Claim fails because the plain words of the statute, as well as its legislative history, shows that gift card holders are not one of the select groups of claimants who receive priority under section 507(a)(7).

### Under the Plain Language of 507(a)(7) Gift Cards Are Not "Deposits"

The Court will start by examining the plain language of the statute. *See Guarracino v. Hoffman*, 246 B.R. 130, 132 (D. Mass. 2000) (citing *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 241 (1989)). If the language is clear and unambiguous, the inquiry ends. *Id.; see also In re Salazar*, 430 F.3d 992, 995 (9th Cir. 2005) (citing *Or. Natural Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir.1996)). On the other hand, if the language "provides no obvious answer . . . the Court can attempt to glean congressional intent from the legislative history." *Guarracino*, 246 B.R. at 132.

Section 507(a)(7) provides that:

(a) The following expenses and claims have priority in the following order:

* * *

(7) Seventh, allowed unsecured claims of individuals, to the extent of $2,850 for each such individual, arising from the ***deposit***, before the commencement of the case, ***of money*** in

---

[7] As noted *supra*, the priority statutes should be construed strictly and narrowly.

> connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, *that were not delivered or provided*.

11 U.S.C.A. § 507(a)(7) (emphasis added).  The Bankruptcy Code does not define the term "deposit."  *WW Warehouse,* 313 B.R. at 592.  "The word's ordinary meaning is thus the starting point and it is appropriate to turn to dictionaries for guidance."  *Id.* (citing 2A SUTHERLAND STATUTORY CONSTRUCTION § 46.2 (6th ed. 2004)).

Case law provides several dictionary definitions of "deposit" in the context of Section 507(a)(7), including: *Heritage*, 137 B.R. at 896 ("to put down as a pledge or partial payment"[8]); *In re DeAngelis Tangibles, Inc.*, 238 B.R. 96, 98 (Bankr. M.D. Pa. 1999) ("money or other property transferred by an offeror to the account of the offeree in conjunction with an offer" [9]); *WW Warehouse*, 313 B.R. at 592 ("The act of giving money or other property to another who promises to preserve it or to use it and return it in kind"[10]); *Salazar*, 430 F.3d at 995 (quoting several definitions, including "[m]oney placed with a person as earnest money or security for the performance of a contract,"[11] and "an amount given as earnest money or forfeit"[12]); and *In re Four Star Fin. Servs., LLC*, 469 B.R. 30, 34 (C.D. Cal. 2012) ("money placed with a person as earnest money or security for the performance of a contract"[13]).

---

[8]  Quoting WEBSTER'S DELUXE UNABRIDGED DICTIONARY, 2d ed. (1979).
[9]  Citing RESTATEMENT (SECOND) OF CONTRACTS § 44 cmt. a (1979).
[10]  Quoting BLACK'S LAW DICTIONARY (8th ed. 2004).
[11]  BLACK'S LAW DICTIONARY 471 (8th ed. 2004).
[12]  Quoting WEBSTER'S SECOND INT'L DICTIONARY 702 (1958).
[13]  Quoting BLACK'S LAW DICTIONARY 504 (9th ed. 2009).

Although this sampling of dictionary definitions indicates slight variations in meaning,[14] the meaning of the term "deposit" is clear.  All of the definitions quoted above agree that:

> the term "deposit" connotes a ***temporal relationship*** between the time consideration is given and the time the right to use or possess is vested in the individual giving the consideration.  The temporal aspect is important because it is what allows section 507(a)(7) to encompass deposits that are a fractional payment, as well as deposits for the full payment amount.  It is this temporal relationship that distinguishes consideration tendered as a deposit from consideration tendered as a mere payment for goods or services.

*In re Nittany Enterprises, Inc.*, 502 B.R. 447, 455 (Bankr. W.D. Va. 2012) (emphasis added) (citing *Palmas*, 443 B.R. at 575 (surveying section 507(a)(7) cases)).  It is hardly surprising that the definition of deposit, in the context of section 507(a)(7), includes a "temporal relationship."   The section expressly applies to incomplete transactions, that is, transactions requiring additional steps to reach completion; it regards money deposits for "the purchase, lease, or rental of property, or the purchase of services . . . ***that were not delivered or provided***" (emphasis added).

---

[14] For example, some definitions only allow for a partial payment, while others allow for either a partial or a full payment.  On this basis, the court in *WW Warehouse* concluded that the dictionary definition of deposit was ambiguous, necessitating an examination of the legislative history.  313 B.R. at 593 ("That the word deposit can mean either a partial payment or a full payment and that courts have construed the word in different ways support the . . . position that an examination of the statute's legislative history is appropriate.").  Nevertheless, today the question whether a deposit only includes partial payments or extends to full payments is more or less answered.  Generally, cases are either silent regarding whether the term encompasses partial as well as full payments, or they explicitly agree with *WW Warehouse* that the term encompasses both.  *See, e.g.*, *Terra Distrib.*, 148 B.R. 598; *In re Tart's T.V., Furniture & Appliance Co., Inc.*, 165 B.R. 171 (Bankr. E.D.N.C. 1994); *In re Glass*, 203 B.R. 61 (Bankr. W.D. Va. 1996) (court's definition encompasses both partial and full payment); *DeAngelis*, 238 B.R. 96; *Salazar*, 430 F.3d 992; *In re Palmas del Mar Country Club, Inc.*, 443 B.R. 569 (Bankr. D.P.R. 2010); *Four Star*, 469 B.R. 30.  Thus, the Court is not required to examine the legislative history.

The definition cited in *Heritage* ("to put down as a pledge or partial payment") illustrates the "temporal relationship," indicating that the deposit does not complete the transaction, i.e., that more is required from the buyer (paying the remainder of the full price) as well as from the seller (delivery of the sale item).  Similarly, the definition in *DeAngelis* ("money or other property transferred by an offeror to the account of the offeree in conjunction with an offer") implies additional steps beyond the transfer of the deposit – namely, acceptance and performance of the contract.  The definition in *WW Warehouse* also points to the future completion of the transaction (the seller will "use [the deposit] and return it in kind"), as do the definitions in *Salazar* ("earnest money or security for the performance of a contract") and in *Four Star* (same).

The court in *WW Warehouse* found gift cards fell under the definitional reach of "deposit" because "[c]onsumers do not purchase gift certificates . . . as the ultimate purchase."  313 B.R. at 595.  In other words, a gift card entails a temporal relationship because purchase of the card contemplates an additional step – use of the card to purchase property or service from the seller.  *WW Warehouse*, however, wrongly focused on "the ultimate purchase," an amorphous concept with potentially unlimited temporal extension.[15]  The court should have focused on the limits of the *transaction*.  The purchase

---

[15] Under Massachusetts law, a gift certificate "sold or offered to be sold shall be valid for not less than 7 years after its date of issuance. . . . . A gift certificate not clearly marked with an expiration date or for which the expiration date is not otherwise made available as provided in this section shall be redeemable in perpetuity."  Mass. Gen. Laws Ann. ch. 200A, § 5D (West); Affidavit of Francesca L. Miceli in Support of the Commonwealth of Massachusetts' Response to the Debtors' Second Omnibus Objection to Claims (D.I. 741-1), Ex. 1 (Commonwealth's Proof of Claim, Ex. A (Addendum to Proof of Claim of the Commonwealth of Massachusetts by the Attorney General Maura Healey ¶ 4)).  Here, the gift cards either lacked an expiration date or stated that they had no expiration date.  Response to Letter at 3.

of a gift card is a short transaction, without a temporal relationship: the consumer makes payment and simultaneously receives the gift card. Whether the consumer uses the gift card in a future transaction, or gives the card to another party and that party uses it in a future transaction, is beyond the scope of the inquiry. *See Util. Craft,* 2008 WL 5429667, at *4 ("[W]hether the Creditor decided to use the Store Credit[16] is not part of the inquiry.").

The appellate court in *In re Northwest Fin. Express* analyzed "the priority status, if any, that should be accorded" claims regarding money orders. 950 F.2d 561, 563 (8th Cir. 1991). The money orders at issue in *Northwest* are analogous to the gift cards in the instant case:

> The stores would sell money orders to their customers and remit the proceeds to [debtor] NWFX . . . . . In essence, the money orders were checks issued by NWFX in exchange for cash. . . . . The money orders purchased by each individual were transferable and, probably, negotiable. The evidence in this case and the other NWFX cases indicates that these orders were purchased mainly by persons without checking accounts to pay for goods and services supplied by third parties.

950 F.2d at 562, 563. A consumer bought the money order, which was issued by debtor NWFX, from the selling store. Later, the consumer might use the money order at either the selling store or another store. Although in the instant case the gift cards were only

---

[16] *VVV Warehouse* correctly likened gift cards to store credits: "While the pleadings frame this issue as relating to 'gift certificates,' the outcome is no different with respect to any claimants holding merchandise credits [i.e., store credit] or those who made partial payments on lay-away items." 313 B.R. at 590, n. 5. The Commonwealth agrees: "Debtors' attempt to distinguish gift cards that result from the return of merchandise *that was purchased* . . . is nonsensical. In either case, the gift card is issued because the Debtor has both its merchandise and consumer funds, and the consumer has only a credit balance that can be redeemed in connection with the purchase of future merchandise." Response to Letter at 16, n. 6 (italics in original).

sold at the Debtors' stores and on their website (Response to Letter at 3), the essential features of the money orders in *Northwest* are the same as those of Debtors' gift cards: both instruments were purchased for cash, "were transferable,"[17] and were to be used "to pay for goods and services."[18]

The *Northwest* court held that the money orders did not constitute deposits under section 507(a)(6)[19]:

> The deal, for section 507(a)(6) analysis, appears to be ***more akin to the purchase of a product (a transferable instrument) for immediate delivery which product is tradeable in lieu of cash***. Admittedly, our approach results in a loose fit when viewed in the context of the Uniform Commercial Code. Our consideration of these exchanges, however, is made here, as indicated, in the framework of claim priorities under section 507(a)(6), not under commercial law. We think that as a matter of policy, statutory priorities should be strictly construed in the bankruptcy context and our construction for the purposes of this appeal fulfills this goal.

950 F.2d at 563 (emphasis added). Similarly, the gift cards at issue here are "more akin to the purchase of a product (a transferable instrument) for immediate delivery."

The store credit at issue in *Util. Craft* is also analogous to a gift card. In that case, the debtor ran a furniture business. *Util. Craft*, 2008 WL 5429667 at *1. The claimant bought a couch from the debtor, paying a deposit of $2,100. *Id.* Upon delivery, the claimant paid the balance. *Id.* The claimant subsequently returned the couch as defective,

---

[17] BLACK'S LAW DICTIONARY (10th ed. 2014) defines *transferable* as "[c]apable of being transferred, together with all rights of the original holder." The gift cards at issue here were meant to be given as gifts, i.e., to be transferred. Response to Letter at 15 (A gift card's "entire purpose is to be transferred to another to be used to make a future purchase.").

[18] The money orders in *Northwest* were also "probably, negotiable." The distinction is insignificant, however, since both money orders and gift cards are products or instruments that the consumer purchases and immediately receives.

[19] The precursor to section 507(a)(7).

and the debtor gave the claimant a store credit for $5,748. *Id.* Before the claimant used the store credit, the debtor filed a chapter 11 petition. *Id.* The claimant sought priority status for the deposit amount, arguing that

> a gift certificate is the same as a store credit. As such, the [claimant] asserts that the court should follow the reasoning applied in *In re VW Warehouse, Inc.*, 313 B.R. 588 (Bankr. D. Del. 2004) and find that the Store Credit arose from the deposit and has to be paid on a priority basis.[20]

*Id.*

The *Util. Craft* court, however, drew an analogy between the store credit and the money order at issue in *Northwest*, where "[e]ssentially, the 'consumer got what it purchased, namely a money order; whether the money order was honored was not part of the transaction.'" 2008 WL 5429667, at *3 (quoting *VW Warehouse*, 313 B.R. at 595, analyzing the reasoning in *Northwest*, 950 F.2d 561). Construing the statute strictly and narrowly, the *Util. Craft* court concluded that the store credit did not qualify as a deposit "within the [r]ealm of 11 U.S.C. § 507(a)(7)" because "the transaction is complete as it relates to § 507(a)(7) [once the store credit is issued]. Following the reasoning in *Northwest*, whether the Creditor decided to use the Store Credit is not part of the inquiry." *Id.* at *3-4.

The limited transactional scope applied by the courts in *Northwest* and *Util. Craft* is consistent with the analysis in *Four Star*, a case involving the purchase of services rather than goods. 469 B.R. 30. In *Four Star*, the class action claimant was a member of a

---

[20] As already noted *supra*, the court in *VW Warehouse* saw no meaningful distinction between a gift card and a store credit. 313 B.R. at 590, n. 5.

campground network. *Id*. at 31-32. Members "paid an initiation fee which permitted them immediate access to [debtor's] network." *Id*. at 31. "The terms of the membership provided for lifetime services and use of the campground network, as well as transferability for the lifetime of three future generations of the member." *Id*. "As in *Palmas*,[21] the initiation fee guaranteed nothing more than entrance into the campground network." *Id*. at 33. In *Palmas*, the membership fee "entitled purchasers to become members of the club, but did not entitle members access to club benefits . . . [which] were only available with the payment of their monthly or yearly dues." *Id*. at 32. In *Four Star*, "members were required to pay annual dues to permit ongoing use of the [debtor's] campground and facilities." *Id*. at 31.

The *Four Star* claimant argued that 507(a)(7) gave his claim priority status because of "services remaining undelivered," specifically "a transferable, lifetime membership, and the services to go with it . . ." *Id*. at 33. In short, the claimant posited that the transaction at issue had practically unlimited durational scope. Faced with this prospect, the court decided to limit the scope:

> [T]he initiation fee paid here by Appellee entitled him to immediate use of the campground network. With the payment of the initiation fee, Appellee was immediately a member. He was not waiting for services to be rendered by [the debtor]. Somewhat illogically, Appellee points to his lifetime membership and transferability as evidence of undelivered services. Assuming this were true, Appellee's bargained-for services would not be delivered for several generations. While not discounting the premium placed on the longevity and transferability of the memberships, the Court finds these benefits inherent in the membership Appellee received immediately, rather than something incapable of delivery for several

---

[21] 443 B.R. 569 (Bankr. D.P.R. 2010).

generations. . . . . The initiation fee was not paid for the future guarantee of services.

*Id.* at 35.   Consistent with *Four Star*, the Court here is unwilling to apply a potentially unlimited transactional duration to gift card purchases.   The transaction extends to receipt of the card and no further.

In the case of a money order, a store credit, or a gift card, the transaction is complete once those instruments are issued.   Therefore, those instruments do not come under the definition of "deposit," and section 507(a)(7) does not afford them priority status.   The Court disagrees with the holding of *WW Warehouse* in regard to the application of section 507(a)(7) to gift cards.

<u>Legislative History</u>

As discussed above, the Court holds that the statutory language is clear and unambiguous and therefore an examination of the legislative history is unnecessary.   *See Heritage*, 137 B.R. at 895 ("The Court concludes that § 507(a)(6) is unambiguous and clear as currently drafted and, consequently, the Court has accorded no weight to the legislative history in reaching the conclusions contained herein.").   Nonetheless, several courts have reached a contrary conclusion.   *See, e.g., Terra Distrib.*, 148 B.R. at 600-601 (examining legislative history, without providing explicit justification for doing so, in order to determine whether definition of deposit encompasses both partial and full payments); *Guarracino*, 246 B.R. at 132-133 (examining legislative history because "it is fairly obvious from the outset that the statute provides at least two possible scenarios. . . .

Unfortunately, the precise meaning of the statute is not evident."); *WW Warehouse,* 313 B.R. at 593 ("That the word deposit can mean either a partial payment or a full payment and that courts have construed the word in different ways support the . . . position that an examination of the statute's legislative history is appropriate."). Because "[d]iffering court interpretations of a statute 'is evidence that the statute is ambiguous and unclear,'" the Court will examine the legislative history. *WW Warehouse,* 313 B.R. at 591–92 (quoting *U.S. v. Iron Mountain Mines, Inc.,* 812 F.Supp. 1528, 1557 (E.D.Cal.1992)). The Court finds, however, that the legislative history weighs in favor of the plain language analysis provided *supra.*

A consumer who purchases a gift card would at first sight seem to be within the class of consumers contemplated by Congress when adopting section 507(a)(7). The House Report[22] states:

> [The section] has been added as a result of testimony before the subcommittee on civil and constitutional rights concerning problems that consumers have encountered with bankrupt retail businesses with whom consumers have deposited money for goods or services . . . . . Because of his ignorance and his inability to bargain with a retail merchant, [the consumer] is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. A recent example is the W.T. Grant bankruptcy. All customers who held "Grant Script" [*sic* – should be "Scrips"] have essentially lost their deposits. In order to remedy this problem and to reorganize the position of consumer creditors as different from those of business creditors, the bill provides a priority for consumer creditors of a bankrupt business. . . .

---

[22] The House Report is the Report of the Committee on the Judiciary on Bankruptcy Law Revision (1977). Committee Reports are "the authoritative source for finding the Legislature's intent" because they "represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Garcia v. United States,* 469 U.S. 70, 76 (1984).

HOUSE REPORT at 188, *as reprinted in* 1978 U.S.C.C.A.N. 6148-49.  Gift card holders may often be ignorant of the risks posed to their cards by bankruptcy and generally unable to do a credit investigation or bargain with a retail merchant for special terms.

Furthermore, the bankruptcy of retailer W.T. Grant in 1976 appears to be directly on point: there, customers purchased coupons from the retailer called "Grant Scrips,"[23] which the customers could "use in the future purchase of merchandise." 4-507 Collier on Bankruptcy P 507.09.  When W.T. Grant filed for bankruptcy, the holders of unredeemed scrips, as unsecured creditors, lost the money they had used to purchase the scrips.  *Id.* "Many of the people who had purchased scrip were under the belief that they had deposited money with W.T. Grant that remained theirs until they redeemed their scrip and were outraged to find that their money had been commingled and dissipated." *Id.* Congress included section 507(a)(7) to protect such consumers in the future.  *Id.*

Closer examination of the legislative history, however, indicates that Congress likely did not intend to protect gift card consumers with section 507(a)(7).  First, gift cards were discussed in a seminal law review article and in House and Senate hearings regarding the drafting of the Bankruptcy Code, but they were not included in the House Report, which is intended to help courts understand the statute.  *See Matter of Sinclair*, 870 F.2d 1340, 1341 (7th Cir. 1989).  Second, the legislative history indicates that Grant Scrips likely were not analogous to gift cards.

---

[23] BLACK'S LAW DICTIONARY (10th ed. 2014) defines *scrip* as "1. A document that entitles the holder to receive something of value. . . . 2. Money, esp. paper money, that is issued for temporary use as a substitute for legal tender. • It constitutes a form of credit."

*Gift Cards Were Addressed in an Article and Hearings, But Not Included in the House Report*

A 1972 Columbia Law Review article, which gave rise to the movement among academics and state attorney generals to include section 507(a)(7) in the Bankruptcy Code, discussed various categories of consumers in need of protection:

> Insolvent retailers commence proceedings for arrangements or straight bankruptcy, leaving several classes of unsatisfied consumers with little by way of remedy. Among the types of buyers commonly affected are those who prepaid for continuing and future services (such as correspondence school lessons); those who prepaid for goods; those who partially prepaid for services or goods (for example, purchases made on the lay-away plan); those who possess *merchandise certificates*[24] or who have returned goods for credit; and those who have left their own goods with the company to be repaired.

Schrag & Ratner, *Caveat Emptor-Empty Coffer: The Bankruptcy Law Has Nothing to Offer*, 72 Colum. L. Rev. 1147 (1972) ("Columbia Law Review article" or "Schrag") (emphasis added) at 1148.[25]

---

[24] Merchandise certificates include gift cards:

> Finally, it should be noted that two particular types of consumers probably have even fewer rights than the average buyer with which to obtain merchandise in the possession of a bankrupt. Customers who have returned goods for credit, either because the goods were non-conforming or because the retailer liberally allowed exchange, and consumers who hold *gift or other merchandise certificates*, are probably barred from claiming any property, whether by way of specific performance, replevin, or any theory of identification. Their interest in the seller's assets is too generalized, and the law, therefore, will relegate them to the status of unsecured creditors.

Schrag at 1164 (emphasis added).

[25] *See* HOUSE REPORT at 188, n. 87 (citing Schrag as well as House hearings on March 15 and 18, 1976, in support of statement: "The fifth priority under H.R. 8200 is new. It has been added as a result of testimony before the Subcommittee on Civil and Constitutional Rights concerning the problems that consumers have encountered with bankrupt retail businesses with whom the consumers have deposited money or goods or services."). *See also Bankruptcy Act Revision: Hearing on H.R. 8200 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 94th Cong. 1732 (1976)("House Hearings")(statement of Rep. Robert Drinan, noting in reference to Rep. Millicent Fenwick's proposal to add section 507(a)(5), that "the article of Shrag [*sic*] and Ratner in the Columbia Law Review, attracted the attention that brought about your very interesting legislation"); *Bankruptcy Reform Act of 1978: Hearing on S. 2266 Before the Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary*, 95th Cong.

Several of the categories of consumers mentioned in the Columbia Law Review article were subsequently discussed in both the House and Senate hearings[26] regarding proposals for section 507(a)(7).[27]  In the March 15, 1976 House hearings, the following categories of consumers were mentioned as in need of priority status protection: consumers who had received defective merchandise from a furniture store, students who had paid a photography school upfront for courses, customers of a mail-order company that cashed customers' checks without sending them any merchandise, a customer "who put down a $30 deposit on a $170 dinette set which she was purchasing on a lay-away basis," other customers who made deposits on furniture with the balance to be paid upon

927, 930 (1977)("Senate Hearings")(Report on Consumer Aspects of Proposed Amendments to the Bankruptcy Act by the New York State Bar Association Committee on Business Law, citing Schrag for observation that "the impact of losses of relatively substantial deposits frequently falls most on consumers who are least able to afford it").  *See also* 4-507 Collier on Bankruptcy P 507.09 (describing the Columbia Law Review article as "[a]lso influential," along with the W. T. Grant bankruptcy, in the adoption of section 507(a)(7)).

[26] *See* preceding footnote for full citations of the House and Senate hearings.

[27] Although statements made during House and Senate subcommittee hearings carry less weight than a Committee Report, they are nonetheless sources a court can turn to when examining a statute's legislative history. *United States v. O'Brien*, 391 U.S. 367, 385 (1968) (noting "that if we were to examine legislative purpose in the instant case, we would be obliged to consider not only these statements [by Congressmen during floor debates] but also the more authoritative reports of the Senate and House Armed Services Committees."); *Garcia*, 469 U.S. at 78 (noting that the dissenter's argument, which relied heavily on statements by a House Committee member, "would perhaps be controlling if there were substantial ambiguity in the language Congress had enacted."). In general, House and Senate hearings are accorded weight only when statements by Members of Congress are cited.  *See Kelly v. Robinson*, 479 U.S. 36, 51 n. 13 (1986) ("We acknowledge that a few comments in the hearings and the Bankruptcy Laws Commission Report may suggest that the language bears the interpretation adopted by the Second Circuit. But none of those statements was made by a Member of Congress, nor were they included in the official Senate and House Reports. We decline to accord any significance to these statements." (citations omitted)).  The following analysis references House and Senate hearings simply to demonstrate that gift cards were discussed and considered during the drafting and enactment of the Bankruptcy Code, not to glean Congressional intent from the statements made.  Additional analysis, *infra*, cites hearing statements to fill out the factual record, not as representative of legislative intent.  Where the analysis does deduce legislative intent, statements by Members of Congress are referenced.

receipt of the goods, and customers who had prepaid for service contracts. House Hearings at 1699-1701, 1705. In various submitted statements and testimony at the March 18, 1976 House Hearings, the following categories of consumers were discussed: consumers who had paid a deposit on future goods and services, consumers who had paid in full for undelivered merchandise, students who had prepaid for courses at correspondence schools, tenants who had given security deposits to landlords, consumers who made down payments, and consumers who had paid membership fees; in addition, the W.T. Grant layaway plan, and layaway plans in general were discussed. House Hearings at 1724, 1726-27, 1733-36.

At the Senate Hearings on Tuesday, November 29, 1977, Paula W. Gold, Assistant Attorney General, Commonwealth of Massachusetts, testified for purposes of providing consumer protection in the Bankruptcy Code:

> Nor is the consumer problem limited to deposits on merchandise. Typically a retail merchant will hold consumer money in a variety of forms. In addition to merchandise deposits, these include prepaid mail orders, layaways, merchandise credits, and *gift certificates*. The business may also hold consumer goods left for repair or adjustment. In general, none of the consumers will have considered the credit aspects of their transactions. None will have had any idea of the financial condition of the business when they made their deposits. Clearly their position sharply contrasts with that of a business creditor.

Senate Hearings at 694 (emphasis added). On January 25, 1978, John J. Degnan, Attorney General of New Jersey, wrote to Senator Dennis DeConcini[28]:

> The current law of bankruptcy has proved inadequate to prevent consumers from taking large losses in bankruptcy court. Consumers do not

---

[28] Chairman of the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary.

realize that monies given to businesses in the form of deposits, prepaid mail orders, layaways, merchandise credits and *gift certificates* are extensions of credit in the ordinary sense, although courts sometimes recognize this fact. Even if consumers did, however, they are not currently afforded a practical method for protecting their interest or negotiating for better terms in the way commercial lenders and suppliers can. For this reason Section 507 of S. 2266 establishes a consumer priority.

Senate Hearings at 1307 (emphasis added).

The House Report only includes some of the consumer categories that were addressed in the Columbia Law Review article and the House and Senate Hearings: "A consumer that pays money on a lay-away plan or as a deposit on merchandise, or that buys a service contract or a contract for lessons or gym membership . . . ." HOUSE REPORT at 188. The Report excluded other consumer categories that had been under discussion, such as consumers who returned merchandise or held gift cards. The implication of this omission is that Congress decided not to provide priority status to gift card holders. *See Zuber v. Allen*, 396 U.S. 168, 185 (1969) (concluding that omission of "'nearby' payments" from the Committee Report indicated that Congress chose not to carve out "another specific exception," since "[i]t would be perverse to assume that congressional drafters . . . were careless in listing their exceptions and selecting the illustrations from the committee report from which their words would ultimately derive content.").

The reason Congress omitted gift card holders is not clear. The legislative record indicates that the purpose of section 507(a)(7) was to protect low income consumers.[29]

---

[29] *See, e.g.*, House Hearings at 1730 (statement of Rep. Millicent Fenwick: "I would like to draw your attention to something that we all know. This is particularly hard on low-income consumers. They are especially vulnerable. They make payments under an installment plan more often than other people, and very often shop in financially marginal neighborhood stores. The loss of a $100 deposit is devastating for some of these families. They do need some established priority system . . ."); at 1731 (statement of Rep.

Congress may have decided that gift card purchasers do not as certainly fall into that consumer category as, for example, consumers who avail themselves of lay-away plans.[30] Congress may have also been motivated by the perception that using bankruptcy law to protect holders of gift cards and store credits presented particularly difficult legal challenges.[31]  In any case, the Court need not reach a conclusion as to why Congress chose to exclude gift card holders from the purview of section 507(a)(7).  The simple fact is that Congress considered the plight of gift card holders in the context of retailer bankruptcy and decided not to afford such consumers priority status under 507(a)(7).

*W. T. Grant Scrips Are Not Analogous to Gift Cards*

The House Report mentions Grant Scrips as an impetus for adoption of section 507(a)(7):

> A recent example is the W.T. Grant bankruptcy. All customers who held 'Grant Script' [*sic* – should be 'Grant Scrips'] have essentially lost their deposits. In order to remedy this problem and to reorganize the position of consumer creditors as different from those of business creditors, the bill provides a priority for consumer creditors of a bankrupt business....

---

Millicent Fenwick: "the banks and the other creditors ate up everything and the consumers received nothing. You see, what is very pitiful about this is that very often these are catastrophic events in the life of a low-income family. Young people buy sets of furniture with $400 down and that is a tremendous loss when the furniture is not delivered; and there is nothing they can do about it."); Senate Hearings at 849 (statement by Vern Countryman, Professor at Harvard Law School: "It was the plight of people of that sort [i.e., low income consumers] that gave rise to the inspiration of the consumer priority.").

[30] *See* Senate Hearings at 848-849 (discussion between Harry D. Dixon, Jr., consultant, Leon Foreman, attorney from Philadelphia, and Vern Countryman, Professor at Harvard Law School, regarding challenges to applying the consumer priority specifically to low income consumers).

[31] *See* Schrag at 1164 ("it should be noted that two particular types of consumers probably have even fewer rights than the average buyer with which to obtain merchandise in the possession of a bankrupt.  Customers who have returned goods for credit, either because the goods were non-conforming or because the retailer liberally allowed exchange, and consumers who hold gift or other merchandise certificates, are probably barred from claiming any property, whether by way of specific performance, replevin, or any theory of identification. Their interest in the seller's assets is too generalized, and the law, therefore, will relegate them to the status of unsecured creditors."); House Hearings at 1735 (statement by Representative Millicent Fenwick regarding store credits for merchandise returns: "I think that would be more difficult to protect the consumer who received the faulty television under the bankruptcy laws.").

HOUSE REPORT at 188.  The court in *WW Warehouse* based its holding, which provided

priority status to gift card holders, in large part on this passage from the House Report.

The court stated:

> Consumers do not purchase gift certificates, whether they be in the form of
> paper or a plastic card similar to a credit card, as the ultimate purchase.
> Consumers expect merchants to apply some or all of the face value of the
> gift certificate toward the ultimate purchase. The gift certificate is really
> nothing more than scrip: "a document that entitles the holder to receive
> something of value." BLACK'S LAW DICTIONARY (8th Ed. 2004).

313 B.R. at 595.  Closer examination of the legislative history indicates that the exact

nature of Grant Scrips is not evident from the record, and the little information that is

available suggests that they were dispositively different from gift cards.  First, holders of

Grant Scrips tended to be low income consumers that "gave rise to the inspiration of the

consumer priority,"[32] in contrast to gift card holders regarding whom there is no

indication of low income status in the legislative history.  Second, Grant Scrips functioned

differently than gift cards.  Vern Countryman, Vice-Chairman of the National Bankruptcy

Conference and Professor at Harvard Law School, testified to the Senate on Tuesday,

November 29, 1977[33]:

> I favored the consumer priority idea, particularly after I learned what had
> happened to a bunch of consumers in the W. T. Grant case who had been
> making payments on lay-away plans and who never got the goods that
> were laid away. They ended up with only an unsecured general claims in

---

[32] Senate Hearings at 699 (statement of Bronson C. La Follette, Attorney General of the State of Wisconsin: "The W. T. Grant Company, after selling millions of dollars worth of coupon books redeemable in Grant's merchandise in violation of the usury laws of Wisconsin and several other states, went bankrupt. Purchasers of these books were often low income customers, least able to afford the loss."); at 849 (statement by Vern Countryman, Professor at Harvard Law School).

[33] Note that Prof. Countryman's testimony is here cited to present factual background regarding the Grant Scrips, not as a representation of Congress's intent.

> the proceeding. I'm informed that the same sort of experience has been seen in other department store bankruptcies and also some dance studio bankruptcies where people had paid in advance for dancing lessons that they never got or exercise emporiums and so on.

Senate Hearings at 847.  Because the Grant Scrips contained a lay-away component, they had a built-in temporal relationship not present in the case of gift cards.  Based on the legislative history, it appears that W. T. Grant customers made lay-away payments to obtain the scrip, which would eventually be used to purchase a good that had been laid away.  In contrast, the purchase of a gift card only involves two nearly simultaneous actions: payment for the card and receipt of the card.  This distinction between gift card holders and Grant Scrip holders is significant, since without the temporal relationship the gift card holder will not receive priority status under 507(a)(7).

## CONCLUSION

For the foregoing reasons, the Court grants Debtors' Objection that the Claim is misclassified as a priority unsecured claim.  Instead, the Claim shall be classified as a general unsecured claim.


Dated:  August 4, 2016

_Kevin Gross_____
KEVIN GROSS, U.S.B.J.

25